**SURRANO LAW OFFICES**
Attorneys at Law

7114 E. Stetson Dr., Suite 300
Scottsdale, Arizona 85251
Phone:  (602) 264-1077
Fax:  (602) 264-2213

Charles J. Surrano III (007732) cjs@surranolawfirm.com
John N. Wilborn (013714) jnw@surranolawfirm.com
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Eunice Peterson Family Partnership, LLLP, E. Peterson Investments, LLC, Arizona Limited Liability Companies, <br><br> Plaintiffs, <br><br> vs. <br><br> AXA Equitable Life Insurance Company, <br><br> Defendant. | Case No.: <br><br> **PLAINTIFFS' COMPLAINT** |

Plaintiffs, Eunice Peterson Family Partnership, LLLP,  and E. Peterson Investments, LLC, for their Complaint against Defendant AXA Equitable Life Insurance Company ("AXA"), state as follows:

1.      This is an action brought by Eunice Peterson Family Partnership, LLP, and E. Peterson Investments, LLC, ("Plaintiffs").

2.      That E. Peterson Investments, LLC is an Arizona Limited Liability Corporation that is licensed to do business in the State of Arizona and that all of its transactions occurred in the State of Arizona

3.      That the original purchaser of the insurance policy at issue in this case, and the original owner of the policy is the Eunice Peterson Family Partnership LLLP, whose principal is Eunice Peterson, received information and marketing of the policy

while in Arizona and purchased the policy while in Arizona, and who is a residence in Arizona.

4.     That E. Peterson Investments, LLC was created as an investment business for the purposes of investing in the insurance policy at issue in this case.

5.     That the insured policy on the policy at issue is Eunice Peterson.

6.     That AXA is a corporation organized and existing under the laws of New York, having its corporate headquarters in New York, New York. The policy lists AXA's home office at 1290 Avenue of the Americas, New York, New York.

7.     That Plaintiffs demand a trial by jury.

8.     That Defendant AXA Athena Universal Life II has inequitably increased the cost of insurance ("COI") in violation of the plan terms of Plaintiffs' Athena Universal Life II ("AUL II") insurance policy.

9.     That the AUL II policy at issue is part of an AXA product line called Athena Universal Life II, and feature flexible-premium, universal life ("UL") policies. The key features of UL policies are that they allow policyholders to pay the minimum amount of premiums necessary to keep the policies in force. This feature differs from other kinds of whole life insurance policies that require fixed monthly premium payments.

10.     That in contrast, owners of UL policies, like Plaintiffs, need only pay an amount sufficient to cover the COI charges and certain other specified expenses. This allows UL policyholders to minimize their capital investment in the policies and to generate greater rates of return through investments *other than* the UL insurance product.

11.     That any optional premium amounts Plaintiffs pay (in excess of COI charges and expense components) are applied to a policy's "Policy Account",

sometimes known as "policy account value" or "cash value". These excess premiums earn interest.

12. That AXA expressly markets the AUL II policyholders by utilizing "fact cards" touting the features that Plaintiffs is able to "design premium payments according to your budget" and can "choose the amount and frequency of your premium payments".

13. That the first page of the AXA policy contains a boldface title calling the policy a "Flexible Premium Universal Life Insurance Policy" and describes the policy as a "flexible premium universal life insurance policy", where the policyholder can, within limits, "make premium payments at any time and in any amount".

14. That although AXA markets the UL policy products specifically to policyholders seeking to minimize their premium payments and keep policy account values as low as possible, AXA has now sought to deprive policyholders who have exercised their option, of their insurance policies or otherwise make policyholders pay exorbitant and extortionate premiums to keep the policy in force.

15. That AXA imposed drastic COI rate increases on certain AUL II policyholders, improperly targeting a subset of policyholders, like Plaintiffs, whom exercise their contractual rights to keep their accumulated policy account values as low as possible and pay flexible premiums.

16. That AXA never gave any notice in the insurance policy or otherwise, that would lead a reasonable person to believe that premium or Cost of Insurance increases could require an exorbitant increase of the previous year's premium.

17. That AXA withheld such information because it knew or should have known that no reasonable person would purchase a policy where this was disclosed as a possibility.

18.     That upon information and belief, AXA has improperly targeted COI rate increases to a subset of universal life policies, that include the Plaintiffs' policy, for their pattern of minimizing premium payments (and keeping policy values as low as possible) – even though the policies expressly permit that premium pattern, and were explicitly marketed to policyholders on the basis that the policies allowed for minimal premium payments and low policy account values.

19.     That AXA has admitted that the COI increases for AUL II policies are targeted at only a subset of policies in the same policy class at issuance.

20.     That the Policies in the subset targeted for the drastic COI increase have two main features in common: the policies have issue ages over age 70, and current face values of over $1 million, which includes Plaintiffs.

21.     That the COI increases AXA imposed are contrary to the express and implied contractual limitations, exorbitant, unreasonable and pre-textual.

22.     That the result of this wrongful program requires that policyholders are required to either allow the policy to lapse after paying years of premiums, or pay extortionate amounts of premium payments to keep the policy in force.

23.     That under either scenario, AXA will reap huge profits at the expense of its policyholders.

24.     That AXA's SEC Form 10-Q for the period ending September 30, 2015, AXA boasted that COI increase will be larger than the increase it previously had anticipated, resulting in a $46 million increase to its net profit.

25.     That AXA's conduct is not permitted by the policy express language.

26.     That the policy issued to Plaintiffs permits AXA to adjust the cost of insurance rates periodically, but only based on certain, enumerated factors, such as changes to reasonable assumptions about morality and investment experience.

27.    That the expressly stated factors do not include allowing a premium adjustment if policyholders, like the Plaintiffs, decide to make minimal funding premium payments.

28.    That pre-textually, AXA stated that the COI increase is warranted because the affected insureds are dying sooner than AXA anticipated, and its investment experience has been less favorable than expected.

29.    That AXA's pre-textual explanation is belied by the facts. Evidence shows that mortality trends for the affected insureds have *improved substantially* since the time the policies issued.

30.    That further investment experience does not depend on the premium payment patterns of any particular policyholder or subset of policyholders, but rather relates to the performance of AXA's overall investments and is thus a *non-sequitur*.

31.    That further, AXA's pre-textual explanation also is contradicted by its prior admissions in its required filings. AXA cannot credibly justify the enormous rate increase on the grounds that it was "based on" a change to anticipated experience because that experience as AXA has stated is substantially more favorable than AXA is expressing.

32.    That by targeting only a subset of risk class of AUL II policyholders, AXA further violated the terms of the policies. The AUL II policies at issue here require that any change in COI rates "will be on a basis that is ***equitable to all policyholders*** of a given class".

33.    That AXA has admitted that its exorbitant COI increases are directed at only a certain subset of policies of the same class at issuance (those with issue ages above 70 and a current face value above $1 million). The increase is impermissible.

34.    That upon information and belief, this not the first time that AXA has improperly, and in violation of the policy terms, increased COI charges for Plaintiffs

5

and other similar policyholders establishing a pattern and practice of consciously wrongful behavior against its own insureds.

35.     That the Eunice Peterson Family Partnership LLP, is owner of an AUL II life insurance policy (number 156232991), insuring the life of Eunice Peterson. The Policy was issued by AXA in Arizona, on or about February 7, 2007, and currently has a face value of $2.5 million (the "Policy"). At issuance, Ms. Peterson was age 83.

36.     That each month thereafter, the Eunice Peterson Family Partnership LLLP paid a monthly premium to keep the policy in force.

37.     That to pay the monthly premium, the Eunice Peterson Family Partnership LLLP  acquired a $1 million single premium immediate annuity that paid a monthly annuity of $14,852.27 or $178,227.00 annually.

38.     That the Policy is subject to AXA's COI increase announced by mail September 25, 2017, and that increased the annual premium from $140,569 to $320,363.

39.     That AXA warned the Plaintiffs that payment was required or the policy would lapse.

40.     That the Plaintiffs have now continued to pay the monthly payment of the premium based on the previous annual premium of $320,363.

41.     That the Policy has remained in force, but the exorbitant increase in premium has damaged and insured the Plaintiffs, whose investment strategy relied on false material statements from the AXA marketing documents and annual prospectuses.

42.     That the Plaintiffs have been forced to pay in excess of double the original COI in order to keep the policy in force.

**JURISDICTION AND VENUE**

43.      That this Court has personal jurisdiction over AXA because it has conducted, and continues to conduct, business in Arizona, and because AXA committed

acts and omissions complained of herein, including issuing many of the policies giving rise to the complaint in Arizona.  AXA has conducted business in the State of Arizona since March 7, 1899, and is a licensed Life & Disability Insurer by the Arizona Department of Insurance. Upon information and belief, AXA has collected billions in premiums in the state of Arizona, including collecting over $162 million in premiums in 2015 alone, the last year for which data was reported.

44.     That Venue is proper in this county because the events giving rise to Plaintiffs' causes of action occurred in Arizona.

## FACTUAL BACKGROUND

45.     That the Policy at issue is an individual, flexible-premium, universal life policy, marketed under the product name Athena Universal Life II, and issued by AXA on August 8, 2006. Hallmarks of the Policy at issue include that there are no fixed or minimum premium payments specified in the Policy.

46.     That such flexible-premium policies are preferred by some policy owners specifically because they allow the owners to pay the bare minimum required to keep the policy in force (i.e., the policy owners can keep the policies' Policy Account Value as low as possible) while preserving capital for other investments that may yield higher returns than the interest to be credited on the Policy Account. It is up to the policyholders to decide whether to keep their Policy Account Value as close to zero as possible (by paying only the bare minimum to cover COI and other administrative expenses needed to keep the policy in effect), or to pay more of the premium in order to build the cash amount subject to interest payments in their Policy Account. By contrast, in the case of fixed-premium policies, the insurer has the use of the premiums in excess of the COI charge and can profit on its own investment of those excess premiums.

47.     That Universal life insurance consists of two separate components. The first is the life insurance or "mortality" component, which an insurance company

charges to cover the risk of the insured's death (*i.e.*, the COI). The second is the accumulated cash value or "savings" component, which functions as an investment vehicle and is where excess premiums accumulate and earn interest. The excess premium is the amount of the premium above the insurer's COI. Universal life insurance "unbundles" these two components to allow policyholders to choose whether to pay just enough premiums to cover the risk of death (*i.e.*, pay solely for the life insurance) or pay more (subject to certain limitations) and build up a cash value that earns tax-deferred interest.

48.     That when an owner of a universal life insurance policy makes a premium payment, that payment is credited towards the funds in the Policy Account, and AXA deducts the COI and other charges from the Policy Account. If the funds in the Policy Account become insufficient to cover the amounts owed for expenses and COI, the policy will enter a grace period and eventually lapse if the policyholder does not make the necessary payments to bring the policy back into force.

49.     That the monthly COI is calculated by a contractual formula where the COI Rate is multiplied by the net amount of risk (the difference between the cash value of the policy and the death benefit) at the beginning of the policy month. The COI Rate is designed to cover the cost of the life insurance policy and is the basis for the COI deduction, the largest and most significant charge under AUL II Policies, including the LSH Policies.

50.     That the AUL II Policies have guaranteed and non-guaranteed components. "Guaranteed" elements, such as the guaranteed minimum interest rate on the savings component, described below, are fixed and cannot be changed by the insurer. Guaranteed elements are subject to review and approval by regulatory authorities, the parameters of which are made available to the general public. The COI Rate is an example of a "non-guaranteed" component, meaning the insurer retains the

right to adjust that element subject to the terms of the contract. At the time the policy was issued, non-guaranteed components usually were not reviewed by, and not limited or approved by, regulatory authorities. Owing to behavior like AXA's, this has recently changed, as discussed below.

51.     That the policy states that AXA "will determine [COI] rates from time to time." However, this determination is carefully circumscribed in a provision entitled "Changes in Policy Cost Factors."  This provision provides:

> Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses. Any change in policy cost factors will never result in an interest crediting rate that is lower than that guaranteed in the policy, or policy charges that exceed the maximum policy charges guaranteed in the policy. Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

52.     That the policy also contains a provision that assures a minimum rate of interest on the Policy Account value, otherwise known as the "guaranteed minimum crediting rate." The guaranteed minimum crediting rate for the Policy is 3%. Moreover, the policy promises that even if other cost-of-policy factors change, including the COI Rates, this will "never result in an interest crediting rate that is lower than" the guaranteed minimum crediting rate.

53.     That the  Policy is a contract of adhesion in that and policyholders, like the Plaintiffs are not permitted to negotiate different terms.

54.     That accordingly, there are a number of express contractual limitations on AXA's ability to institute COI Rate changes, including: (1) all changes must be based on "reasonable assumptions as to expenses, mortality, policy and contract claims,

9

taxes, investment income, and lapses;" (2) all changes must be "equitable to all policyholders of a given class;" (3) any changes cannot result in a crediting rate that is less than the guaranteed minimum crediting rate; and (4) any changes will be determined in accordance with procedures and standards on file with the applicable state insurance regulators.

55.     That insurers such as AXA are not permitted to increase insurance premiums to make up for past losses or lower profits, as AXA itself recognized. In internal documents regarding "AXA's policy on assessing the need for actions with respect to Non- Guaranteed Elements (NGE) for [life insurance] policies," AXA claimed in 2014 that it "will ensure [its] NGE actions conform with generally accepted actuarial practice as well as guidance provided in Actuarial Standard of Practice (ASOP) No. 2." AXA explained that it would "not make any NGE actions to recoup past losses" based on its interpretation of draft New York insurance regulations, which provide that changes to non-guaranteed elements must be based on "Anticipated Experience Factors," *i.e.*, "assumption[s] as to a *future* Experience Factor as determined by the insurer." AXA further explained that it would not make any NGE actions to recoup past losses based on its interpretation of rules established by the Interstate Insurance Product Regulation Commission, which provide that adjustments to non-guaranteed elements "shall be based on *future* anticipated or emerging experience."

56.     That Actuarial Standard of  Practice No. 2, which provides guidance to actuaries with respect to the determination of non-guaranteed elements of life insurance policies, states that "[t]he actuary should consider conducting tests of illustrated nonguaranteed charges or benefits to ascertain whether those could be supported by reasonably *anticipated* experience," and further states that when available and appropriate, the actuary should disclose "the anticipated experience factors used in the determination of nonguaranteed charges and benefits and any material changes in such

factors from the last determination." *See* ASOP No. 2. ASOP No. 2 defines "anticipated experience factors" as an "assumption that reflects anticipated experience and may be used to determine nonguaranteed charges or benefits. A particular anticipated experience factor reflects *future* experience of a specific type. Examples of experience factors include investment income, mortality, policy termination, and expense rates." *Id.* (emphasis added). Thus, rate increases must be based on projections of what the insurer believes will occur in the future.

57.     That AXA professed its practices conformed to the Actuarial Standard of Practice.

58.     That there is no reasonable basis upon which AXA could have concluded that its future mortality experience would worsen (it is generally known that mortality rates have improved over time, and consistent with this trend, AXA's own internal documents reflect improvements in mortality experience) or that its future interest income would drop (it is generally known that interest rates have been on the rise and are expected to continue to increase), the two key metrics upon which AXA purported to base its COI Rate increase.  In the same AXA-internal document, and based on its interpretation of the same authorities, AXA also claimed in 2014 that it would "not make any changes to [non-guaranteed elements] for any policies based upon changes in profit objectives," and that AXA had "no intention of changing [its] profit objective."

59.     That AXA has explicitly promoted these flexible-premium policies as policies that allow policyholders to "design premium payments according to your budget" and to "choose the amount and frequency of your premium payments".

60.     That as one would expect, the amount of the COI charge is highly material to universal life policyholders for two key reasons: (1) the COI charge is typically the highest expense that a policyholder pays; and (2) the COI charge is deducted from the Policy Account (i.e., the savings component) of the policy, so the

policyholder forfeits the COI charge entirely to AXA (this is in contract to the balance of premium payments, which, after the expenses are deducted, are deposited into the Policy Account and credited with interest by AXA).

61.     That all AXA policies in the AUL II product line contain the same common language about how the COI rates will be determined:

> We will determine cost of insurance rates from time to time.
> Any change in the cost of insurance rates we use will be as
> described in the "Changes in Policy Cost Factors" provision.

62.     That in turn, the "Changes in Policy Cost Factors" provision states:

> Changes in policy cost factors (interest rates we credit, cost of
> insurance deductions and expense changes) ***will be on a basis
> that is equitable to all policyholders of a given class***, and
> will be determined ***based on reasonable assumptions as to
> expenses, mortality, policy and contract claims, taxes,
> investment income, and lapse***… Any change in policy cost
> factors will be determined in accordance with ***procedures and
> standards on file, if required, with the insurance supervisory
> official of the jurisdiction in which the policy is delivered***.

(Emphasis added)

63.     That the Policy at issue is a contract of adhesion: a form policy, and insureds are not permitted to negotiate different terms.

64.     That once AXA accepts the policy premium payments it accepts its fiduciary-like obligation to protect Plaintiffs and to treat Plaintiffs' rights equal to its own.

65.     That on or about October 1, 2015, AXA announced that, effective with the first monthly deductions occurring in 2016, it would increase the COI rates for AUL II policies with issue ages of 70 or older and with current face amounts of $1 million and higher. AXA notified Plaintiffs of the future increase by letters dated October 5, 2015.

66.     That AXA has provided no justification for the COI increase other than to claim it is based solely on two factors: allegedly less favorable "future mortality and investment experience" over the past few years.

67.     That the Wall Street Journal quoted an AXA spokesperson explaining the reason for the increase as: "the company had concluded one of its older life-insurance products wasn't performing as expected because policyholders were dying sooner and investments were earning less than forecast when the policies were sold."

68.     That AXA's SEC Form 10-Q, for the period ending September 30, 2015 stated, "the Company is raising the COI rates for these policies as management expects future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established." And, AXA has distributed a FAQ on the "Athena Universal Life II COI Rate Change", in which the increase is explained as follows: "We expect future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established and because our view of the anticipated experience has changed, this has necessitated a change in COI rates."

69.     As with the amount of the increase, AXA also never explained to policyholders how its mortality and investment income assumptions had altered. Indeed, AXA has not publicly disclosed, made available for public comments, or publicly filed any of its revised COI Rates or the documents supporting its decision to increase such rates. AXA has argued against the public disclosure of any analyses that could supposedly support the COI Rate increase. Further, the percentage increase of COI Rates was never made publicly available for comment prior to its implementation.

70.     That COI increases breach the policy because: the COI Rate increase was not "equitable to all policyholders of a given class;" the COI Rate increase was not "based on reasonable assumptions as to expenses, mortality, policy and contract claims,

taxes, investment income, and lapses;"  *the* COI Rate increase effectively was an evasion of the contractually guaranteed minimum crediting rate of 3%; by instituting the COI Rate increase, AXA failed to comply with policy provisions requiring it to change policy cost factors consistent with regulations and standards on file with the applicable state insurance regulators;  the COI Rate increase breached the implied covenant of good faith and fair dealing that is inherent in every insurance policy, and AXA implemented its COI Rate increase to recoup lost profit expectations and boost its profit margins, rather than in response to new future projections of mortality experience and interest income expectations.

71.    That unbeknownst to its insureds, in February 2015, a mere 7 months prior to first announcing its exorbitant COI increases, AXA disclosed to the State of New York, that it anticipated no experience factors underlying any non-guaranteed elements that were different than previous experience, contrary to its current allegations.

72.    That the policy at issue lists the only six "reasonable assumptions" that may trigger a COI rate change under the terms of the policy. The six factors a permitted COI may be "based on" are "expenses, mortality, policy and contract claims, taxes, investment income, and lapses." Any COI rate adjustments must be 'based on' the enumerated factors, and only those factors.

73.    That AXA publicly stated that the 2016 increase was based on only two factors, which are investment experience and mortality.

74.    That Contrary to AXA's claims that the increase is warranted in part because it found that "policyholders were dying sooner" than expected, mortality rates have actually improved steadily each year – i.e., mortality risks have only gotten better over time, as people are living much longer than anticipated when the products were priced and issued.

75.     That the Policy at issue specifically utilized the "1980 Commissioners Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables" (for attained ages 18 and over) ("1980 CSO") as the basis for establishing maximum insurance costs.

76.     That in the intervening years, there have been multiple studies and updates to mortality tables relied upon by the insurance industry.

77.     That the 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the Society of Actuaries ("SOA") (which performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables). Periodically, the Society will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include:

- 1990-95 Basic Select and Ultimate Mortality Tables

- 2001 Valuation Basic Mortality Table

- 2008 Valuation Basic table ("VBT")

- 2015 Valuation Basic Table

78.     That the 2001, 2008 and 2015 Valuation Basic tables each show *significant mortality improvements* from the 1990-1995 Basic tables, demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently, and that trend continues. AXA itself recognized that in 2014, the SOA finalized new mortality tables and a new mortality improvement scale, reflecting improved life expectancies and an expectation that the trend of improving mortality will continue.

79.     That for older aged insureds – like those impacted by the extreme COI increase – the trend of improving mortality is even more pronounced. In particular, the

2008 VBT showed an improvement for older age mortality as compared to prior tables used at the time the AUL II policies were priced. More importantly, the trend in improving mortality for older ages continued with the introduction of the 2014 VBT.

80.    That in the face of improving mortality experience, as reflected in the updated tables, there is simply no negative mortality experience to justify an increase in the COI, let alone the steep increases AXA imposed. Indeed, through early 2015, AXA continued to inform regulators that it had not in fact observed a negative change in its mortality experience, wholly undercutting its pre-textual basis for the increase.

81.    That AXA also claims that the increase was based on a change to its expectations of future "investment experience".  Further, "investments were earning less than forecast when the policies were sold." Although, "investment experience" is not a listed factor that may be considered for increasing COI rates, "investment income" is a listed factor.

82.    That AXA aggregates its capital to make investments into various financial instruments and assets, such as bonds and securities. These investments earn "income" that changes depending on how well the assets are performing. Whether investment income rises or falls, the performance of those investments is entirely unrelated to the funding decisions or premium payment patterns of an individual policyholder or even a subset of policyholders. Therefore, even if AXA's investment income has changed, this factor cannot justify inflicting a COI increase solely ***on the subset of AUL II policies*** upon which AXA has sought to impose the COI increase (those with higher issue-ages and face-amounts).

83.    That to impose a COI increase due to a change in reasonable investment income assumptions, the increase should, in some way, actually correspond to observed changes in investment income. However, since approximately 2004, in its public reports, there has been no discernable change in the pattern of AXA's investment

income, and no correlation between "investment income" and premiums received, that would in any way justify the exorbitant COI increase in 2016.

84.     That there is no dispute that the COI increase specifically targets policyholders who exercised their contractually permissible right to minimally fund their policies. Further that policyholder funding patterns, or Policy Account Value, are not enumerated factors that AXA may consider in adjusting its COI rates.

85.     That further, even if AXA were somehow permitted to consider funding patterns in increasing COI rates, it could not have had any change in its "reasonable assumptions" as to how these policies would be funded. AXA marketed the policies as flexible-premium policies; at issuance, AXA knew these policies would attract owners, such as life settlement investors, who typically minimally fund the policies.

86.     That the policy mandates that "Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis ***that is equitable to all policyholders of a given class*.**" As a result, a policy change may not unfairly discriminate against certain policyholders within the same class.

87.     That AXA's COI increase is not "equitable to all policyholders of a given class" because it impermissibly singles out and discriminates against a subset of policyholders within a larger risk class.

88.     That the only "class" that is referred to in the Policy is the "Rating Class" or "class of risk," neither of which is based upon issue age or face value. A copy of the AUL II Product Guide distributed to AXA's sales force refers to Rating Classes as "Underwriting Classes," but Underwriting Classes represent a range of mortality risks, such as a "Preferred Plus Non-Tobacco User" or a "Standard Non-Tobacco User." *See Exhibit* 5. While certain issue ages qualify for specific Underwriting Classes, neither issue age nor face value themselves constitute the Rating or Underwriting Class. For

1  example, the Preferred and Preferred Plus Underwriting Classes consist of issue ages 70
2  and above as well as 69 and below.

3      89.    That, more importantly, there is no equitable or actuarial basis for singling
4  out AUL II Policies with issue ages of 70 and above when this set of insureds' age did
5  not create a sub-class at the time of issuance of such policies.

6      90.    That there also is no equitable or actuarial basis for targeting AUL II
7  Policies with face amounts of $1 million and above when this face amount did not
8  create a rating class at the time of issuance of such policies. Prior to the COI Rate
9  increase, AXA's mortality rate assumptions for any given insured were equal for a
10 $999,999 and a $1 million face value policy. However, the COI Rate increase has been
11 applied in a step fashion and arbitrarily affects only the latter and not the former. The
12 result is that a $1 difference in policy face value results in a COI Rate disparity between
13 the two policies of over 40%. AXA cannot reasonably expect that the insured on a
14 policy issued at age 70 with $1 million in face value is likely to die materially sooner
15 than the insured on a policy issued at age 70 with $999,999 in face value.  Put simply,
16 the $1 million policyholder is being treated inequitably as compared to the $999,999
17 policyholder, and no reasonable assumption as to mortality would differ between
18 policies and justify this artificial and discriminatory treatment.

19     91.    That there is also no actuarial support for AXA's mortality assumptions.
20 Indeed, actuarial studies indicate *lower* mortality rates for policies with larger face
21 amounts. *See, e.g.*, Report to the Society of Actuaries by Mary Bahna-Nolan, May 23,
22 2012, at 7. According to the Actuarial Standards Board, an "A/E ratio" equals: actual
23 deaths in a group of lives being evaluated over a specified period of time divided by the
24 expected deaths over the same period. Upon information and belief, AXA's A/E ratios
25 of issue age 70 or more and with more than $1 million in face value are consistent with
26 industry ratios—and actually demonstrate a *more favorable* mortality experience than

18

face amounts of less than $1 million, but policies with face amounts of less than $1 million were not subject to the COI Rate increase. Upon information and belief, AXA's own A/E data demonstrates its inequitable treatment of policyholders in a given class.

92.     That even if the COI Rate increase were based on a reasonable assumption as to future investment income (which it was not), AXA's overall investment income expectations do not justify the increases on only a subset of policyholders based on their issue age and/or the face amount of the policy.  Upon information and belief, AXA does not make investment decisions on a policy-by-policy basis, as the money for investments is pooled together and performance does not depend on any particular policyholder or subset of policyholders. Accordingly, the COI Rate increase is not being implemented "on a basis that is equitable to all policyholders" in the relevant class. Furthermore, if there were adverse changes in AXA's investment income expectations, interest rates would have a greater impact on AUL II Policies with lower rather than higher issue ages, because AXA would expect to realize the shortfall in expected investment income over the course of many more years for AUL II Policies with lower issue ages.

93.     That the Policy does not permit AXA to use issue age or face value as a basis to raise COI Rates or to create a class of policyholders. There is a contractual commitment by AXA not to single out a small group of policyholders unfairly and subject them to a rate hike. If AXA simply could manufacture classes whenever it so desired, it would render the contractual language meaningless.

94.     That the COI Rate increase is inequitable also because it treats policies within a specific risk class differently. For example, the increase will not apply consistently to "Standard" risk-class policyholders across all face values or issue ages. It is not equitable to re- determine COI Rates for certain policies in a specific risk class while completely ignoring the  other policies in the same risk class, even though those

1   similarly-situated policies had been priced together and had similar experiences.

2   Treating members of the same risk class differently retrospectively, that is, after

3   issuance of their policies, and applying a COI Rate increase to only a portion of that

4   group is contrary to the plain language of the policies.

5       95.    That AXA is targeting its increased COI Rates on policyholders based on

6   their funding patterns, which is neither equitable nor permissible. AXA increased the

7   COI Rate on a group of policyholders that were selected in part for their pattern of

8   premium payments—those who exercised their contractually permissible right to fund

9   their policies minimally. But funding pattern or Policy Account value is not one of the

10  enumerated factors that AXA may consider in adjusting its COI Rates. AXA may not

11  punish policyholders merely for exercising their contractual right to select a desired

12  funding pattern—a desire the policies were designed and marketed to satisfy.

13      96.    *Finally*, that AXA has not increased COI Rates across the board for AUL

14  II Policies or other products. AXA has represented to the public that it has no plans to

15  raise COI Rates on any other products, including products it is currently selling. If AXA

16  actually had projected worsening mortality or lower investment income going forward,

17  its COI Rates would have increased for a broad range of life insurance policies, not

18  merely a subset of the AUL II Policies (*i.e.*, policies purchased by insureds 70 or older

19  and with a face amount of $1 million and above). That AXA implemented such a

20  narrow and targeted COI Rate increase confirms that the change was done in an

21  inequitable manner.

22      97.    That it is neither equitable nor permissible to increase premiums on

23  policyholders based on their funding patterns. The policies are expressly marketed and

24  designed as flexible-premium policies that permit policyholders to select whatever

25  funding pattern they choose, provided only that they pay enough to keep the policies in

26  force. It is simply inequitable for AXA to punish policyholders merely for exercising

these fundamental contractual rights. More importantly, the policies, which enumerate the only permissible factors to consider in increasing COI rates, do not mention minimal funding or premium payment patterns as permissible factors to consider when increasing the COI.

98.     That there is no actuarial justification for increasing the COI rates on the selected group of policies – those with issue ages 70 and above and current face value amount of $1 million and above. The policy does not permit AXA to use issue-age or face value to determine who gets a COI increase. Rather, of the limited permissible factors, AXA only claims that mortality and investment income are relevant to its decision to increase COI rates. But AXA cannot reasonably expect that the insured on a policy that issued at age 70 with $1,000,000 in face value is likely to die materially sooner than the insured on a policy that issued at age 70 with $900,000 in face value. Nor is it plausible that AXA's reasonable assumptions about future mortality and investment income experience would differ between these two policies. Because insurance companies do not make investment decisions on a policy-by-policy basis, rather, they pool money for investments, the performance of those investments does not depend in any way on the premium payment patterns on any particular policyholder or subset of policyholders. In other words, issue-age and face-amount, the criteria that AXA used for determining the subset of policies to saddle with an enormous COI increase, do not coincide with any actuarially acceptable reasons for imposing a COI increase on the selected policies. As a result, the increase is not being implemented "on a basis that is equitable to all policyholders" in the relevant Policy.

99.     That AXA has not increased COI rates across the board for other UL policies. Indeed, in its FAQ on the AUL II increase, AXA states that "at this time, we have no plans to raise COIs on any other products, including products we are currently selling."

100.    That AXA distributed illustrations to the Plaintiffs showing its projections of future premiums and account values based on various assumptions.  These illustrations were produced at policy inceptions and issuance and then would repeat on an annual basis thereafter.  Each of the policy illustrations contained fraudulent misrepresentations to induce the purchase of the AUL II policies and to encourage the continuing payment of premiums.

101.    That AXA knew that it intended to impose the increase in premiums and failed to disclose the nature, purpose and extent of the increase.

102.    That although the illustrations provided at issuance and subsequently as listed above were tailored to specific policies, each illustration similarly purported to show the growth of the Policy Account value and the embedded COI deductions that the policyholder could expect through the maturity of the policy. Based on the data provided in those illustrations, including the projected "Annualized Premium Outlay" and the "Net Policy Account Value," a recipient such as LSH or their predecessors in interest or their agents could calculate and rely upon the embedded COI Rate curve to determine whether (a) to buy the policy in the first instance; (b) to premium finance it; (c) to sell or purchase the policy on the secondary market; or (d) to continue to fund the premiums for the policy.

103.    That all of the LSH Policy illustrations listed above were distributed before AXA implemented the COI Rate increase. During this period, the COI Rate curves were consistent year after year in each policy's illustrations, and the COI for each policy year was materially consistent.

104.    That, however, after AXA implemented the COI Rate increase, AXA's illustrations for each of the LSH Policies showed, for the first time, that the previously embedded COI Rate curves were no longer accurate. It was not until this time that it became apparent to LSH that AXA's pre-COI increase illustrations reflected false and

artificially low COI deductions. AXA committed fraud and other wrongs not because it distributed illustrations that later proved merely to be inaccurate forecasts of the future; rather, as is now known, and as discussed in more detail below, AXA distributed illustrations that at the time it knew to be misleading and wrong. AXA had planned the COI Rate increase for years, yet kept the increase secret and continued to distribute illustrations it knew did not disclose or account for AXA's planned COI Rate increase. Accordingly, numerous policyholders, including LSH, purchased and maintained AXA policies based on projections provided by AXA that AXA knew were false.

105.   That, to illustrate these points, the COI deductions for the LSH Doe Policy for policy years 12 – 21 in the July 2015 pre-COI Rate increase illustration can be compared to the ones in the 2017 post-COI Rate increase illustrations.  In the July 2015 illustration, COI deductions total $17,427,482 for year 12 through year 21.  These COI deductions for years 12 through 21 are materially consistent with the projected COI deductions in all six of the prior years' illustrations. New COI deductions after the COI Rate increase are shown in the February 2017 and July 2017 illustrations. In the February 2017 illustration, the COI deductions for year 12 through year 21 now total $22,029,527—an increase of almost $5 million over this time period. Similarly, the July 2017 illustration shows COI deductions for year 12 through year 21 totaling $22,309,205, also resulting in an increase of almost $5 million when compared to years 12 – 21 of the July 2015 illustration.

106.   That a comparison of pre-COI Rate increase illustrations and post-COI Rate increase illustrations for each LSH Policy reveals that each of the 53 LSH Policies suffered a massive increase in premiums as a result of the COI Rate increase.

107.   That the differences between these illustrations immediately before and after the COI Rate increase show the dramatic increase in COI deductions.  If AXA's stated reasons for its COI Rate increase are to be believed, then the projections it

provided to the original purchaser and to the Plaintiff in 2014 and before were consistently misleading and false year after year. Indeed, as alleged in more detail below, AXA had planned this massive COI Rate increase since at least 2006, but nevertheless continued to distribute illustrations that hid the planned increase.

## COUNT ONE: BREACH OF CONTRACT

108.    That the Plaintiffs reallege and incorporate herein the all the previous allegations of this Complaint as if fully set forth herein.

109.    That the subject Policy is a binding and enforceable contract.

110.    That under the terms of the policy, specifically, the "Changes in Policy Cost Factors" provision, any changes made to policy cost factors must be made on a "basis that is equitable to all policyholders of a given class" and determined based on the enumerated factors listed therein.

111.    That AXA's rate increase has materially breached the Policy in several respects, including but not limited to the following:

    a.  AXA breached the Policy by increasing COI rates based on a policy's issue age and face value even through those factors are not included in the permissible and enumerated bases for increasing cost of insurance rates;

    b.  AXA breached the policies by increasing the COI rates on bases that do not apply equitably to all policyholders of a given class of insureds; and,

    c.  The COI rate increase was not based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investments income and lapses.

    d.   AXA breached the policies because AXA's COI rate increase was not based on the permissible factors stated in the policies, such as AXA's expectations of future mortality.

    e.   AXA implemented its COI rate increase to recoup lost profit expectations and boost its profit margins, rather than in response to new future projections of mortality experience and interest income expectations.

112.   That Plaintiffs had performed all of their obligations under the Policy, except to the extent that its obligations have been excused by AXA's breach as set forth herein.

113.   That as a direct and proximate cause of AXA's material breaches of the Policy, Plaintiffs have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

114.   That Plaintiffs are entitled to an award of attorney's fees and costs.

**COUNT TWO: COMMON LAW FRAUD**

115.   That Plaintiffs reallege and incorporate herein the allegations of this Complaint as if fully set forth herein.

116.   That the subject Policy is "merchandise" as that word is used in the Arizona Consumer Fraud Act.

117.   That AXA's marketing documents constitute "advertising" as that word is used in the Arizona Consumer Fraud Act.

118.   That AXA represented and/or advertised the subject Policy in a way that caused the Plaintiffs to reasonably believe that they were purchasing flexible-premium, universal life policy, without fixed or minimum premium payments specified in the Policy to allow  Plaintiffs to pay the bare minimum required to keep the policy in force (i.e., the policy owners can keep the policies' Policy Account Value as low as possible)

while preserving capital for other investments that may yield higher returns than the interest to be credited on the Policy Account.

119.   That AXA, at the inception of the roll-out on the AUL II policies, utilized exceptionally low reductions to the mortality tables in order to make its product more competitive on the open market to gain advantage over competitors.

120.   That AXA actuaries acknowledged that their mortality tables were unrealistic as early as 2003 and 2004.

121.   That AXA would incorporate these unreasonably low calculations when disclosing to potential insureds COI rates for policies that these potential insureds, like the Plaintiffs wished to purchase.

122.   That AXA has explicitly promoted these flexible-premium policies as policies that allow policyholders to "design premium payments according to your budget" and to "choose the amount and frequency of your premium payments".

123.   That AXA markets itself as financially strong and one of the world's largest insurance and wealth management companies.

124.   That AXA markets its purpose as: "To help provide financial security for our clients and their families."

125.   That AXA peddles protection and security.

126.   That AXA, through its actions, omissions and limitations, and advertising, led the Plaintiffs to believe that AXA was offering flexible-premium policies to "design premium payments according to your budget" and to "choose the amount and frequency of your premium payments".

127.   That the AXA's policy that it advertised and offered, to the Plaintiffs and thereby, Plaintiffs accepted and paid for, is not a "flexible-premium" universal life insurance policy to "design premium payments according to your budget".

1       128.    That each year thereafter the Plaintiffs would receive annual COI

2   projections that would continue this ruse.

3       129.    That these projections were misleading because the stated values were not

4   based on actual values.

5       130.    That it was not until 2015 that AXA began to disclose the actual market

6   values of these AUL II policies.

7       131.    That AXA created and offered a numeric summary based upon the

8   previously described erroneous mortality assumptions to the Plaintiffs in February 2007,

9   at or near the policy inception where in projected premiums were set at $136,645

10  through ten years.

11      132.    That this numeric summary was relied on by the Plaintiffs when they

12  decided to purchase the policy.

13      133.    That each year thereafter on February, 2007, 2008, 2009, 2010, 2011,

14  2012, 2013 and 2014, the Plaintiffs received misleading and false annual reports

15  claiming to disclose the calculated values of the policy and the planned monthly

16  premium for the upcoming year and each year for all those years the planned monthly

17  premium never changed.

18      134.    That these calculations were false and misleading and AXA knew they

19  were false and misleading because they were based on unreasonably reduced mortality

20  rates upon which the pricing was based.

21      135.    That AXA never disclosed to the Plaintiffs that between 2007 and 2014,

22  AXA's assumptions had already changed.

23      136.    That AXA knew as early as 2006 that it would have to drastically increase

24  the COI values for the Plaintiffs, but never disclosed it until it had duped  the Plaintiffs

25  into 10 years of premiums.

26

27

137.   That even after AXA had disclosed to the Plaintiffs that its COI would increase, it continued to hide the real reason.

138.   That no warning or disclosure ever discussed the possibility of a 100% or more increase in premium from one year to the next.

139.   That upon information and belief AXA knew that a large COI increase would be necessary as early as 2007, when the Plaintiffs were deciding to purchase the policy.

140.   That AXA failed to disclose these facts to the Plaintiffs at the time they decided to purchase the policy.

141.   That all conditions precedent to paying flexible-premium insurance benefits have been met by Plaintiffs.

142.   That AXA caused insureds such as the Plaintiffs to believe that they had purchased flexible-premium universal life insurance coverage and is liable.

143.   That AXA made material affirmative misrepresentations and/or omissions that were reasonably relied on by the Plaintiffs to their detriment, and caused them to purchase insurance that met neither their needs nor their requests, and was not the flexible-premium universal life insurance coverage that the Plaintiffs, requested and thought they were buying.

144.   That the Plaintiffs, relied on these material misrepresentations and omissions that induced them to purchase the policy to their ultimate detriment.

145.   That as a direct and proximate result of the conduct as alleged, the Plaintiffs have been injured and damaged by being forced to allow the policy to lapse rather than pay the extortionate fees.

146.   That the conduct of AXA, in leading the Plaintiffs to believe that they were purchasing flexible-premium universal life insurance, violated the Arizona Consumer Fraud Act.

147.    That because these actors acted with a conscious disregard for the likelihood that harm would result, the Plaintiffs are entitled to an award of punitive damages.

WHEREFORE, The Plaintiffs pray for judgment against AXA and in favor of the Plaintiffs as follows:

A.    For an amount of special damages to be determined at trial;

B.    For an amount of general damages to be determined at trial;

C.    For an amount of punitive damages sufficient to punish AXA and to deter future similar conduct and to deter it and other likeminded insurance companies of similar conduct in the future;

D.    In the alternative, for the court to enter an order rescinding the contract and require AXA to return all the premiums paid together with interest and attorney's fees.

E.    For attorneys' fees incurred;

F.    For taxable costs incurred; and

G.    For other just and further relief as this Court deems proper on the premises.

DATED:    September 13, 2018.

SURRANO LAW OFFICES

By:    s/ John N. Wilborn
        Charles J. Surrano, III
        John N. Wilborn
        7114 E. Stetson Dr., Suite 300
        Scottsdale, Arizona  85251
        Attorneys for Plaintiffs